UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **UNITED STATES** | : | **DOCKET NO. 16-cr-300** |
| **VERSUS** | : | **UNASSIGNED DISTRICT JUDGE** |
| **JOSEPH WILBON and** **MARVA FLENORY** | : | **MAGISTRATE JUDGE KAY** |

**REPORT AND RECOMMENDATION**

Before the court is a Motion to Suppress [doc. 29] filed by defendant Marva Flenory ("Flenory"). Through this motion she seeks to suppress statements and physical evidence arising from a vehicle stop. Her codefendant, Joseph Wilbon ("Wilbon"), adopts the motion. Docs. 42, 43. A hearing was held on this matter before the undersigned on August 17, 2017, after which the parties submitted additional memoranda on a new basis for suppression raised at hearing. Docs. 53, 54, 57. For reasons stated below, **IT IS RECOMMENDED** that the motion be **DENIED**.

**I.**
**BACKGROUND**

Defendants Flenory and Wilbon are each charged with one count of possession with intent to distribute a controlled substance and aiding and abetting each other in same, a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2. Doc. 14. The charges involve "a mixture and substance containing a detectable amount of cocaine," and relate to events that occurred on June 8, 2016.[1] *Id.*

---

[1] The instant charges arise from a superseding indictment filed on February 9, 2017. Doc. 14. The original indictment, filed on December 14, 2016, alleged that the crime occurred on April 14, 2016. Doc. 1.

Flenory and Wilbon were arrested on that date after a vehicle stop initiated by Louisiana State Trooper Chris Hill, who was on proactive patrol on I-10 East near milepost 35.[2] Doc. 29, att. 2, p. 5. From this location he observed a tan Chevrolet Equinox with a Pennsylvania license plate riding on the left dashed line. *Id.* He initiated a traffic stop of this vehicle at approximately 8:30 am, pulling it over near milepost 38. *Id.*

The driver of the vehicle was identified as Wilbon and the passenger as Flenory. *Id.* Hill spoke to Wilbon outside of the vehicle and informed him of the reason for the stop, while Flenory remained in the front passenger seat. *Id.*; doc. 29, att. 3, 1:00. Wilbon could not explain why he had drifted out of his lane, but offered Hill his driver's license and medical card (despite the fact that he was not driving a commercial vehicle and Hill had not requested the card).[3] Doc. 29, att. 2, p. 5; doc. 29, att. 3, 1:04. Hill then began asking about their travel. Doc. 29, att. 2, p. 5; doc. 29, att. 3, 1:27. Both stated that they were traveling from Houston, where they had been visiting Wilbon's cousin. Doc. 29, att. 2, pp. 5–6; doc. 29, att. 3, 1:27, 3:04. As Hill began to close Flenory's door, ending his conversation with her, Flenory added that she was retired from work as a cardiologist technician, having started a business with Wilbon, and that she wanted to travel. Doc. 29, att. 2, p. 6; doc. 29, att. 3, 3:27. However, Wilbon offered that they had been in Houston

---

[2] Hill's report is the source for material cited at attachment 2 to Docket Entry 29. Dash camera video, which begins with Hill's pursuit of the defendants' vehicle, is the source for material cited at attachment 3. The same footage was offered as an exhibit at the motion hearing. Doc. 50.

[3] The government asserts, and the defendants do not refute, that a medical card is only required for drivers of commercial vehicles. Wilbon also apparently stated that he had a business driving trucks and hauling cars, though this portion of the footage is difficult to hear. Doc. 29, att. 3, 2:00; *see* doc. 36, p. 4.

since Saturday (June 4) while Flenory said they had been there since the preceding Thursday (May 26).[4] Doc. 29, att. 2, pp. 5–6; doc. 29, att. 3, 3:10; *see* doc. 52, pp. 18–19 (Hill's testimony).[5]

Hill returned to his vehicle, checked the defendants' license numbers and the vehicle's registration and insurance. Doc. 29, att. 3, 4:00. He then returned to Wilbon and asked him again about his travel plans. *Id.* at 13:14. Wilbon confirmed that he had been visiting his cousin and had arrived on Saturday. *Id.* When Hill asked why Flenory had stated that they arrived on Thursday, Wilbon gave an inaudible response recorded in Hill's report as stating that "she did not know what she was talking about." *Id.* at 13:30; doc. 29, att. 2, p. 6.

Hill returned to his vehicle again and was informed of the defendants' arrest histories. He was told over the radio that Wilbon had a lengthy arrest history, including, among others, multiple drug charges, theft, and weapons charges, with the last occurrence listed in 2014. Doc. 29, att. 3, 16:30. He was also told that Flenory's history included multiple arrests, though none explicitly related to drug activity, with the last listed in 2006. *Id.* at 17:08.

Hill then exited his vehicle and asked Wilbon to sign a consent to search the vehicle, citing the inconsistencies in their stories as basis for his suspicions. *Id.* at 21:34. Wilbon declined to give consent. *Id.* at 23:08. Hill then asked Flenory to step out of the vehicle and informed them that a K-9 unit would be coming to search for drugs and that their consent was not required for this search. *Id.* at 23:55; *see* doc. 29, att. 2, p. 6. The K-9 sniff gave a positive alert to the presence of

---

[4] Flenory, who was the second to be questioned about their time in Houston, confirmed her answer in the initial exchange.
        Flenory: "We've been out there since last Thursday."
        Hill: "Since last Thursday?"
        Flenory: "Mmhmm."
        Hill: "So, like, end of May Thursday?"
        Flenory: "Yeah…end of May."
Doc. 29, att. 3, 3:10.

[5] The wind noise on the dash camera footage is too loud to hear Wilbon's responses to these questions. *See* doc. 29, att. 3, 1:31. However, Flenory provides the same representations of his answers based on the footage as the ones cited in Hill's report. *See* doc. 29, att. 1, p. 2.

narcotics in the vehicle, and a search then revealed six "brick like" packages inside a suitcase, with the packages containing approximately 15.96 pounds of suspected cocaine. Doc. 29, att. 2, pp. 6–7; *see* doc. 29, att. 3, 28:03. Wilbon and Flenory were handcuffed at the scene and placed under arrest. Doc. 29, att. 2, p. 6; doc. 29, att. 3, 39:30. By her own admission in this motion, Flenory made several incriminating statements while in custody. Doc. 29, att. 1, p. 4.

Flenory filed the instant motion to suppress, adopted by Wilbon. She argues that the traffic stop exceeded the limits imposed by the Fourth Amendment, and that the physical evidence and statements resulting from that stop should therefore be excluded from trial in this matter. Doc. 29, att. 1.

A hearing was held on this motion before the undersigned, at which hearing Hill testified. Doc. 52. There he noted other factors, in addition to those listed in his report, that had contributed to his suspicions. These included his determination that I-10 did not provide the most direct route back to Pennsylvania from Houston, Texas; his belief that a five-day stay, based on Wilbon's account, meant a quick turnaround on a twenty-plus hour road trip; Wilbon's hesitation at naming where his cousin lived; and the fact that Flenory stated they were stopping in New Orleans, which Wilbon did not mention, but did not have an immediate answer as to whether they would stay the night. *Id.* at 11–13, 17–18. He also noted that, as he began to walk away from Flenory, she attempted to continue the conversation by offering him more details. *Id.* at 19. Hill stated that, based on his training and experience, it was suspicious for people to offer him information that he did not ask for and that he believed that Flenory was "trying to give [him] more information to make her story more plausible." Doc. 52, p. 19. Finally, he noted Wilbon's mood changed after he (Hill) informed him about the discrepancy in their stories, with Wilbon becoming defensive and cursing. *Id.* at 21–22, 25.

The defense, through cross-examination, contested all of these characterizations, eliciting Hill's agreement that there could be alternate explanations for the individual circumstances he described as suspicious and emphasizing the lack of other signs of nervousness in the pair's behavior. *Id.* at 37–39. They emphasized the fact that the defendants' stories were consistent on every point except the date of arrival in Houston, and that Hill had suggested that it was the last Thursday in May rather than first Thursday in June. *Id.* at 28–35. They maintained that the stop became an illegal detention after the criminal background checks were obtained and no active warrants or "Be On the Look Outs" were found. *Id.* at 70. They also raised new grounds for suppression, contesting the questioning of Flenory as violating *Miranda*. *Id.* at 75–76. To this end they emphasize Hill's testimony that, although he asserted that he was patrolling for traffic violations, he did not have his radar activated and never wrote the defendants a ticket. *See id.* at 42–43, 53 (Hill's testimony).

Following the hearing the parties submitted supplemental briefs addressing only the *Miranda* issue, as the Fourth Amendment arguments were covered in their original briefs. Docs. 53, 54, 57; *see* doc. 52, pp. 77–78. We now consider both grounds for suppression.

## II.
### LAW & ANALYSIS

### A. *Fourth Amendment Violation*

The Fourth Amendment of the United States Constitution provides a guarantee to individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. Because the Fourth Amendment is silent on how this protection is to be enforced, the courts have created the "exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 131 S.Ct. 2419, 2423 (2011).

Where a challenged search or seizure was effected without a warrant, the government bears the burden of showing that it was constitutionally valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). A traffic stop is a seizure for purposes of the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). "The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.E.D.2d 889 (1968)." *United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007). This framework entails examining (1) whether the officer's action of stopping the vehicle was justified at its inception and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *Id.* Here the defendants challenge the stop under the second prong, arguing that the justification for the seizure had ended by the time Hill completed his background checks of the vehicle and its occupants. According to the government, Hill justifiably extended the stop and called in the K-9 unit based on a reasonable suspicion that the defendants were engaged in criminal activity.

As part of a traffic stop, an officer may conduct a reasonable inquiry, including running a computer check on driver and vehicle papers. *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). He may also ask questions about the subjects' itinerary and the purpose of their trip. *Brigham*, 382 F.3d at 508. He may even ask unrelated questions, so long as these do not extend the duration of the stop. *Shabazz*, 993 F.2d at 436–37. However, "once the tasks tied to the traffic infraction are—or reasonably should be—completed, the authority for the seizure ends unless the Government can show an exception to the Fourth Amendment that allows the stop to continue." *United States v. Peña-Gonzalez*, 618 Fed. App'x 195, 198 (5th Cir. 2015) (quoting *Rodriguez*, 135 S.Ct. 1609, 1614 (2015)) (quotations and alterations omitted). One "oft-invoked exception,"

derived from *Terry*, permits extension of the stop if reasonable suspicion of additional criminal activity emerges or existed in the first place. *Id.*

Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (quotations omitted). In other words, it requires the officer to articulate something more than a "hunch." *Id.* However, the level of suspicion this standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less than is necessary for probable cause." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (quotations omitted). If additional grounds for suspicion emerge, the stop may extend "as long as is reasonably necessary" to resolve it. *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512).

Hill's questioning of Flenory and Wilbon, and his background checks on their licenses and vehicle, were undisputedly within the scope of the traffic stop. Flenory argues, however, that the reason for the traffic stop was resolved by the time the checks were completed, around minute 17 of the dash camera footage, and that the observations noted in Hill's report did not provide justification for extending the stop.[6] Flenory emphasizes that the report only cites the inconsistent statements about travel plans as justification for Hill's suspicions. However, from the dash camera footage and the narrative section of the report, it is clear that Hill also noted the defendants' criminal histories and Wilbon's insistence on showing his medical identification card.

---

[6] As Flenory notes, there is Fifth Circuit dicta supporting the notion that inconsistencies in the subjects' stories are insufficient, alone, to create a reasonable suspicion under Fifth Circuit case law. *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006); *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003); *see United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010). She also argues that the Fifth Circuit has found that, **after a computer check came back clean**, nervousness and inconsistent statements alone did not provide a reasonable suspicion to continue a traffic stop. *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002); *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999). In this case, however, the computer checks did not come back clean and instead showed, in Wilbon's case, a recent arrest history and a record of arrests for drug-related charges.

-7-

Flenory contests Hill's characterization of Wilbon as "insistent" on showing the medical card, noting that he only offered once to show the card and explained his reason for having it. She disputes the assertion of nervous laughter and characterization of Wilbon's responses as suspicious in the government's motion, described *supra* at note 7. She also maintains that Wilbon's offer to show the medical card can be explained by the fact that he had a business driving trucks and hauling cars. Doc. 36, p. 4. However, these subjective determinations are not disproven by the video evidence. Moreover, the officer's testimony gave a highly credible account as to how all of these factors worked together to increase his suspicion.

Finally, we are unmoved by the argument that the officer should not have been suspicious because the defendants' stories were consistent on every point other than their arrival date – the discrepancy still accounted for more than a week's difference in the length of their stay in Houston, and the fact that Hill suggested which Thursday it might be has little bearing given Flenory's commitment to the answer.

Because of the criminal histories for both defendants, but particularly Wilbon, and other factors cited above, a suspicion of criminal activity appears reasonable at the time that Hill extended the detention for the K-9 search. Therefore the government has carried its burden as to the extension of the traffic stop, and there is no grounds for suppression under this claim.

### B. *Miranda Argument*

The defendants argue that Flenory was subject to custodial interrogation from the moment Hill began talking to her. Doc. 53, p. 4. Based on the fact that he did not read her a *Miranda* warning prior to beginning this conversation, they maintain that her statements are inadmissible to support Hill's justifications of the traffic stop in the challenge above. *Id.* at 4–5.

The Fifth Amendment provides a guarantee against compelled self-incrimination. U.S. CONST. amend. V. In *Miranda v. Arizona*, 86 S.Ct. 1602 (1966), the Supreme Court announced a set of safeguards "to combat 'the inherently compelling pressures of custodial interrogation.'" *United States v. Gonzalez-Garcia*, 708 F.3d 682, 686 (5th Cir. 2013) (quoting *Maryland v. Schatzer*, 130 S.Ct. 1213, 1219 (2010)). The rights set out in a *Miranda* warning may only be waived voluntarily, knowingly, and intelligently. *Miranda*, 86 S.Ct. at 1612.

In the years since the *Miranda* decision, the Supreme Court has time and again affirmed that "if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated [in *Miranda*], his responses cannot be introduced into evidence to establish his guilt." *Berkemer v. McCarty*, 104 S.Ct. 3138, 3144 (1984). In other words, "[p]otential violations occur [under *Miranda*] only upon the admission of unwarned statements into evidence at trial." *United States v. Patane*, 124 S.Ct. 2620, 2629 (2004), To show that the government is seeking to admit statements in violation of *Miranda*, a defendant in Fifth Circuit courts bears the initial burden of showing that he was in custody for *Miranda* purposes while being interrogated. *United States v. Augustine*, 2007 WL 1673543, *3 (S.D. Miss. Jun. 7, 2007) (citing *United States v. Wells*, 755 F.2d 382, 390 (5th Cir. 1985)).

Defendants offer no support for the notion that suppression under *Miranda* applies to exclude unwarned statements from use in a suppression hearing as a basis for the officer's suspicions. As the government notes, *Miranda* only applies to exclude testimonial evidence. *United States v. Bengivenga*, 845 F.2d 593, 600 (5th Cir. 1988). Nontestimonial evidence may not be excluded even if obtained in violation of *Miranda*, and a *Miranda* violation does not trigger the fruit of the poisonous tree doctrine. *Id.* at 600–01. Therefore it does not appear that the defense's

*Miranda* arguments could be used to suppress any part of the officer's testimony or to exclude the drugs seized and statements Flenory later made in custody as a result of the traffic stop.

### III.
#### CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that the Motion to Suppress [docs. 29, 43] be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 59(b) of the Federal Rules of Criminal Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 12th day of September, 2017.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE