UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **UNITED STATES** | **:** | **DOCKET NO. 2:16-cr-300** |
| **VERSUS** | **:** | **CHIEF JUDGE HICKS** |
| **JOSEPH WILBON and** **MARVA FLENORY** | **:** | **MAGISTRATE JUDGE KAY** |

## SUPPLEMENTAL REPORT AND RECOMMENDATION

Before the court is a Motion to Suppress [doc. 29] filed by defendant Marva Flenory. Through this motion she seeks to suppress statements and physical evidence arising from a vehicle stop. Her codefendant, Joseph Wilbon, adopts the motion. Docs. 42, 43. A hearing was held on this matter before the undersigned on August 17, 2017, after which the parties submitted additional memoranda on a new basis for suppression. Doc. 52; *see* docs. 53, 54, 57.

After receiving that briefing we issued an initial Report and Recommendation [doc. 58], recommending that the motion be denied. Flenory and Wilbon both filed objections to that report and recommendation. Docs. 59, 60. The case was subsequently reassigned to Chief Judge S. Maurice Hicks, Jr., who issued an order referring the Report and Recommendation to us for additional consideration. Doc. 63.

Based on Chief Judge Hicks's order, we have considered the defendants' objections and reviewed the briefing and hearing transcript already filed in this matter. For reasons stated below, we **RECOMMEND** that the Motion to Suppress [doc. 29, 43] be **DENIED**.

# I.
## BACKGROUND

Defendants Flenory and Wilbon are each charged with one count of possession with intent to distribute a controlled substance and aiding and abetting each other in same, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2. Doc. 14. Both the charges and the Motion to Suppress relate to a traffic stop that occurred on June 8, 2016. *Id.*; *see* doc. 58, pp. 1–5 (background section of initial report and recommendation). On that date, at around 8:30 in the morning, Louisiana State Trooper Chris Hill, who was on proactive patrol, saw a vehicle with Pennsylvania plates traveling eastbound on I-10 near Lake Charles, Louisiana. Doc. 29, att. 2, p. 5. He initiated a stop after witnessing the vehicle fail to maintain its lane. *Id.*

After pulling the vehicle over Hill talked to the occupants, Wilbon and Flenory, for a few minutes. During this time Wilbon stood outside of the vehicle while Flenory remained in the passenger seat. Flenory offered Hill details about her job that he did not ask for and Wilbon attempted to give him his medical card, required of commercial truck drivers, even though he was not driving a commercial vehicle. *See* doc. 29, att. 3, at 1:00–3:50. They also told him, separately, about their travels – agreeing that they were traveling from Houston back home to Pennsylvania after a visit with Wilbon's cousin, but providing different dates, over a week apart, when asked when they had arrived in Houston. *Id.*; doc. 52, pp. 18–19. Additionally, Flenory stated that they planned to stop in New Orleans, a fact Wilbon failed to mention, but she did not have an immediate answer about whether they would spend the night. Doc. 29, att. 3, 2:43; *see* doc. 52, pp. 11–13, 17–18.

Hill returned to his vehicle to run checks of the defendants' licenses and vehicle. *See* doc. 29, att. 3, 4:00. He then walked back to Wilbon and asked him again about his travel plans. *Id.* at 13:14. Wilbon confirmed that he had been visiting his cousin and had arrived on Saturday. *Id.*

When Hill asked why Flenory had stated that they arrived on Thursday, Wilbon gave an inaudible response recorded in Hill's report as stating that "she did not know what she was talking about." *Id.* at 13:30; doc. 29, att. 2, p. 6.

Hill returned to his vehicle again to receive the results of his checks. He was told over the radio that Wilbon had a lengthy arrest history, including, among others, multiple drug charges, theft, and weapons charges, with the last occurrence being a burglary arrest in 2014. Doc. 29, att. 3, 16:30. He was also told that Flenory's history included multiple arrests, though none explicitly related to drug activity, with the last listed in 2006. *Id.* at 17:08. Otherwise, the checks were clear, indicating no active warrants, Be On the Lookouts, or indications that the vehicle was stolen. *See id.* at 17:22.

Hill then returned to the couple and asked Wilbon to sign a consent to search the vehicle, citing the inconsistencies in their stories as basis for his suspicions. *Id.* at 21:34. Wilbon declined to give consent. *Id.* at 23:08. Hill asked Flenory to step out of the vehicle and informed them that a K-9 unit would be coming to search for drugs and that their consent was not required for this search. *Id.* at 23:55; *see* doc. 29, att. 2, p. 6. The K-9 sniff gave a positive alert to the presence of narcotics in the vehicle and a search then revealed six "brick like" packages inside a suitcase, with the packages containing approximately 15.96 pounds of suspected cocaine. Doc. 29, att. 2, pp. 6–7; *see* doc. 29, att. 3, 28:03. Wilbon and Flenory were handcuffed at the scene and placed under arrest. Doc. 29, att. 2, p. 6; doc. 29, att. 3, 39:30. By her own admission in this motion, Flenory made several incriminating statements while in custody. Doc. 29, att. 1, p. 4.

Flenory filed the instant motion to suppress, adopted by Wilbon. She argues that the traffic stop exceeded the limits imposed by the Fourth Amendment, and that the physical evidence and statements resulting from that stop should thus be excluded from trial. Doc. 29, att. 1.

-3-

A hearing was held on this motion before the undersigned, at which Hill testified. Doc. 52. There he noted other factors, aside from those listed in his report, which had contributed to his suspicions. These included his experience working for the state police and knowledge of I-10 from Houston as a drug-trafficking corridor[1], his determination that I-10 did not provide the most direct route back to Pennsylvania from Houston; his belief that a five-day stay, based on Wilbon's account, meant a quick turnaround on a twenty-plus hour road trip; Wilbon's hesitation at naming where his cousin lived; and the fact that Flenory stated they were stopping in New Orleans, which Wilbon did not mention, but did not have an immediate answer as to whether they would stay the night. *Id.* at 11–13, 17–18, 27. Hill also noted that, as he began to walk away from Flenory, she attempted to continue the conversation by offering him more details. *Id.* at 19. Hill stated that, based on his training and experience, it was suspicious for people to offer him information that he did not ask for and that he believed that Flenory was "trying to give [him] more information to make her story more plausible." Doc. 52, p. 19. Finally, he stated that Wilbon's mood changed after he (Hill) informed him about the discrepancy in their stories, with Wilbon becoming defensive and cursing. *Id.* at 21–22, 25.

The defense, through cross-examination, challenged all of these characterizations, eliciting Hill's agreement that there could be alternate explanations for the individual circumstances he described as suspicious and emphasizing the lack of other signs of nervousness in the pair's behavior. *Id.* at 37–39. They emphasized the fact that the defendants' stories were consistent on every point except the date of arrival in Houston, and that Hill had suggested that it was the last Thursday in May rather than first Thursday in June. *Id.* at 28–35. They maintained that the stop

---

[1] Hill stated that, in over ten years of working for the Louisiana State Police, he had made "hundreds of traffic stops on I-10[,] several of which have resulted in narcotics seizures" and that these narcotics were often being transported from Houston. Doc. 52, p. 27. According to his training and experience, Houston is the "hub city" from which drugs brought in from Mexico are distributed across the United States. *Id.* at 27–28.

became an illegal detention after the computer checks were complete and no active warrants or Be On the Look Outs were found.[2] *Id.* at 70.

Following the hearing we recommended that the Motion to Suppress be denied. Doc. 58. On instruction from the district judge, we now issue this supplemental report and recommendation reconsidering whether the extension of the traffic stop violated the Fourth Amendment.

## II.
### LAW & ANALYSIS

The Fourth Amendment of the United States Constitution provides a guarantee to individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. Because the Fourth Amendment is silent on how this protection is to be enforced, the courts have created the "exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 131 S.Ct. 2419, 2423 (2011).

Where a challenged search or seizure was effected without a warrant, the government bears the burden of showing that it was constitutionally valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). A traffic stop is a seizure for purposes of the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). "The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.E.D.2d 889 (1968)." *United States v. Stevens*, 487 F.3d 232, 244 (5th Cir. 2007). This framework entails examining (1) whether the officer's action of stopping the vehicle was justified at its inception and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified

---

[2] They also raised new grounds for suppression, contesting the questioning of Flenory as violating *Miranda*. *Id.* at 75–76. We consider this claim disposed of for the reasons stated in our preceding report and recommendation. *See* doc. 58, pp. 8–10.

the stop. *Id.* Here the defendants challenge the stop under the second prong, arguing that the justification for the seizure had ended by the time Hill completed his background checks. According to the government, Hill justifiably extended the stop based on a reasonable suspicion that the defendants were engaged in criminal activity.

As part of a traffic stop, an officer may conduct a reasonable inquiry, including running a computer check on driver and vehicle papers. *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). He may also ask questions about the subjects' itinerary and the purpose of their trip. *Brigham*, 382 F.3d at 508. He may even ask unrelated questions, so long as these do not extend the duration of the stop. *Shabazz*, 993 F.2d at 436–37. However, "once the tasks tied to the traffic infraction are—or reasonably should be—completed, the authority for the seizure ends unless the Government can show an exception to the Fourth Amendment that allows the stop to continue." *United States v. Peña-Gonzalez*, 618 Fed. App'x 195, 198 (5th Cir. 2015) (quoting *Rodriguez*, 135 S.Ct. 1609, 1614 (2015)) (quotations and alterations omitted). One "oft-invoked exception," derived from *Terry*, permits extension of the stop if reasonable suspicion of additional criminal activity emerges, or existed in the first place. *Id.*

Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (quotations omitted). In other words, it requires the officer to articulate something more than a "hunch." *Id.* However, the level of suspicion this standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less than is necessary for probable cause." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (quotations omitted). If additional grounds for suspicion emerge, the stop may extend "as long as is reasonably necessary"

to resolve it. *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512).

Hill's questioning of Flenory and Wilbon and background checks on their licenses and vehicles were undisputedly within the scope of the traffic stop. Flenory argues, however, that the reason for the traffic stop was resolved by the time the checks were completed, around minute 17:30 of the dash camera footage, and that the observations noted in Hill's report did not provide justification for extending the stop.

As Flenory notes, there is Fifth Circuit dicta supporting the notion that inconsistencies in the subjects' stories are insufficient, alone, to create a reasonable suspicion under Fifth Circuit case law. *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006); *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003); *see United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010). She also argues that the Fifth Circuit has found that, **after a computer check came back clean**, nervousness and inconsistent statements alone did not provide a reasonable suspicion to continue a traffic stop. *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002); *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999). As we emphasized in our prior report and recommendation, however, the checks in this matter did not come back as "clean" but instead showed that both defendants had considerable criminal histories, with Wilbon's drug charges and recent arrest history a particular concern. Flenory argues in her objections, however, that the "[t]he purpose of a computer check is not to determine criminal history, but instead . . . to ensure there are 'no outstanding warrants and that the vehicle had not been stolen.'" Doc. 59, p. 2 (citing *Dortch*, 199 F.3d at 199). Accordingly, she maintains, the computer check came back "clean" in this matter despite the lengthy criminal history report. *See Dortch*, 199 F.3d at 196–98 (noting that computer check came

back negative while also stating that officers discussed details of the defendant's criminal record with him).

In *Dortch*, however, the Fifth Circuit found that the vehicle occupants' inconsistent stories – which had to do with the defendant's relationship to the person who had rented the car he was driving without authorization – could only give rise to a reasonable suspicion that the defendant had stolen the car. *Id.* at 195–96, 199. Accordingly, the defendant was cleared of that suspicion when the warrants and stolen vehicle check came back clean.[3] Meanwhile, in *Santiago*, the court specifically noted that both the "[d]river's-license and criminal-history checks . . . came back negative" and that the officer had admitted that he no longer suspected the defendant of abduction or having stolen the car **after** the criminal background check was complete. 310 F.3d at 338–39, 343 n. 5. Accordingly, the court determined, the officer illegally extended the stop when he continued to detain the defendant after those checks. *Id.* at 342. Likewise, in *United States v. Gonzalez*, the Fifth Circuit considered the defendant's arrest history for narcotics trafficking, obtained in part from a computer check during a traffic stop, to support the officer's reasonable suspicion of drug trafficking and justification for extending the stop. Thus, defendants show no basis why their arrest histories – which they admit were obtained within the permissible scope of a traffic stop – could not contribute to the officer's suspicions in this matter.[4]

---

[3] *Dortch*'s requirement that the officer's suspicion relate to a specific crime was discarded by the Fifth Circuit, sitting *en banc*, in *Brigham*, supra, 382 F.3d 500 (5th Cir. 2004). *See Pack*, 612 F.3d at 353–56. Thus, while the panel never explained what the defendant's criminal history was in *Dortch*, it might have proven more relevant after *Brigham* if it supported a suspicion that **some** criminal activity was afoot.

[4] The defendants allege that their criminal histories could not have supported a reasonable suspicion of criminal activity in this case, arguing in relevant part that it has not been shown that any of Wilbon's charges related to drug trafficking in particular. Doc. 59, p. 7. We reject this argument. Given the circumstances of the encounter and the other suspicious factors cited by Hill relating to the defendants' travel and their accounts, Wilbon's lengthy criminal history, including a history of arrests on drug related charges, could certainly provide support Hill's admitted suspicion by that point that defendants were trafficking drugs. *See* doc. 52, pp. 48–49.

As the Fifth Circuit recently noted in *United States v. Davis*, 620 Fed. App'x 295 (5th Cir 2015) (unpublished), it has "upheld extended detentions when factors such as nervousness and presence on a known drug-trafficking corridor were coupled *Id.* at 299 (citing *Pack*, 612 F.3d at 352, 361; *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006); *Brigham*, 382 F.3d at 504, 508–09). Those factors are met here, given that the discrepancy shows that at least one of the defendants was lying about their travel plans, the video evidence supports Hill's account of the defendants' nervousness, and the defendants do not contest Hill's characterization of I-10 from Houston as a drug-trafficking corridor.

Additionally, we reject defendants' alternate explanations for many of the factors cited by Hill as increasing his suspicions because "*Terry* . . . precludes this sort of divide-and-conquer analysis." *United States v. Arvizu*, 122 S. Ct. 744, 751 (2002). "Courts must allow law enforcement 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Estrada*, 459 F.3d at 632 (quoting *Arvizu*, 122 S.Ct. at 750–51) (internal quotations omitted). Hill's testimony established his experience with narcotics trafficking along I-10, and he gave a highly credible account as to how, due to his training and experience, all of the factors he cited worked together to increase his suspicion. Because of the criminal histories for both defendants (particularly Wilbon), their inconsistent stories, travel from out-of-state on a known drug-trafficking corridor, nervous demeanors, and the change in Wilbon's mood – from laughing to cursing – once confronted about the discrepancies in their stories, a suspicion of criminal activity certainly seems reasonable at the time that Hill extended the detention for the K-9 search. Therefore the government has carried its burden as to the extension of the traffic stop, and there is no basis for suppression under this claim.

### III.
#### CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that the Motion to Suppress [docs. 29, 43] be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 59(b) of the Federal Rules of Criminal Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 29th day of January, 2018.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE